## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**CLIFTON E. BEASLEY,**                          CASE NO. 3:24 CV 511

      Plaintiff,

      v.                          JUDGE JAMES R. KNEPP II

**USAA GENERAL INDEMNITY
COMPANY,**

      Defendant.                          **MEMORANDUM OPINION AND
ORDER**

### INTRODUCTION

Currently pending in this insurance contract case is Defendant USAA General Indemnity Company's Motion for Summary Judgment (Doc. 16). Plaintiff Clifton E. Beasley opposes (Doc. 19) and Defendant replies (Doc. 20). Jurisdiction is proper under 28 U.S.C. § 1332. For the reasons set forth below, Defendant's Motion is granted in part and denied in part.

### BACKGROUND

Plaintiff owns a residential rental property at 3401 Gorney Place in Toledo, Ohio ("the Property"). Defendant insured the Property under an insurance policy issued to Plaintiff, in effect from November 3, 2021 to November 3, 2022 ("the Policy"). *See* Doc. 16-2, at 2-53. The Policy included the following provision:

**15. Concealment, Misrepresentation or Fraud**

a.    At our option we may deny coverage or declare the entire policy void from the beginning of the policy term if you are any other **"insured"**, whether before or after the loss, has:
> (1) Intentionally concealed or misrepresented any material fact or circumstance;
> (2) Engaged in fraudulent conduct relating to this insurance; or

> (3) Made false statements which, if known by us, would have caused us not to:
>> (a) Issue the policy;
>> (b) Issue the policy in as large an amount;
>> (c) Provide coverage for the hazard resulting in the loss; or
>> (d) Issue the policy for the same amount of premium or at the same rate.
>
> If we void the policy, we will refund the premium for the policy period. The premium refund will be offset by any claim amounts paid under the policy to any **"insured"** during this policy period.

*Id.* at 33.

On May 18, 2022, the Property was damaged by fire and Plaintiff opened a claim with Defendant under the policy. *See id.* at 56-57, 135. Defendant hired a Certified Fire Investigator to determine the cause and origin of the fire. *See id.* at 219-36 (report). In a report dated June 1, 2022, the investigator concluded:

- The origins of the fire were in five separate non-communicating areas of the house.
- The first fuel ignited was vapors from an ignitable liquid.
- The ignition source was a handheld open flame device.
- The oxidant was atmospheric air.
- The ignition sequence was vapors from the ignitable liquid spread over five separate areas in the house were ignited with a handheld open flame device. Fire ensued.

*Id.* at 227-28.

Defendant argues Plaintiff made material misrepresentations during its investigation regarding: (1) Plaintiff's access to the Property, and (2) the condition of the home including structural and foundation issues. *See* Doc. 16. The Court therefore summarizes the record evidence as to each below.

Access to Property

Defendant conducted an initial interview of Plaintiff on May 23, 2022. (Doc. 16-2 at 877-932). By way of background, prior to the fire, Taniqua Williams was Plaintiff's tenant. *Id.* at

887. She was moving out and, per Plaintiff, supposed to be out no later than May 15. *Id.* at 889. Neighbors across the street wanted to rent the Property. *Id.* at 889-90. During the May 23, 2022 interview, Defendant's agent asked Plaintiff about his access to the Property:

Q: Okay. Did you ever have a key—did you have keys to the residence?

A: I finally got the key. But I've been fighting until she—. . . I thought it was gonna be multiple keys and she was supposed to put them in my mailbox and I kept texting her like I don't have these keys, I don't have these keys. And finally figured out one . . . it was just one key and it got stuck in the mail, so we didn't find it until later on.

Q: Did you have the key before or after the fire?

A: About the same time. It was . . . either the day—the day after or . . . I would have to look at the texts, but I . . . texted her when I realized okay, we finally found the key. But I can't remember what day.

Q: So you're not sure if you had the key before or after the fire?

A: Right. But I know I have the text, so the text will . . . give me an idea. I just don't remember offhand. But . . . that's what we were originally texting back and forth because I wanted the keys to I could let . . . the folks across the street come in and see what was going on and see if they . . . really liked the place. But they . . . pretty much wanted it. He's been there I think at least 20 years.

*Id.* at 890-91.

Defendant extracted information from Plaintiff's cell phone, including his text messages with Williams. *See id.* at 248-834 (extracted phone contents). These contents included several messages from Plaintiff to Williams from April 22 through May 11 requesting Williams provide him with keys to the house. *See id.* at 831-33. On May 11, Williams indicated she had left the key in the mailbox. *Id.* at 833. The next day, Plaintiff responded that he did not see the key in the mailbox. *Id.* On May 16, Plaintiff texted Williams: "I found key yesterday. I will be going to the property tomorrow 5/17/2022, one neighbor interested in buying and another across the street wants to rent. Is there anything else of yours in the property? I saw the motor cycle [sic] in the

garage. Mr. Beasley." *Id.* at 380. Williams responded the same day that she still had possessions in the house. *Id.*

Defendant re-interviewed Plaintiff on July 12, 2022. *Id.* at 849-76. He was again questioned about possession of a key to the residence:

Q:      When did . . . Tanequa Williams provide you a key to the property?

A:      That was . . . the biggest problem. She was supposed to provide a key. . . . I never got the key. And then when she did provide the key, actually, it would be a cadre of keys because I had separate keys for every lock. . . . She said she put it . . . in the mailbox. But I kept checking the mailbox and I didn't have keys. And then finally she came by here . . when I was talking to my neighbor[.] I was cutting the grass, I cut the grass in both places and she said it was in the bottom of the mailbox. But it was only one key and I was looking for a bunch of keys. So when the mail would be in there . . . I looked and it was the mail and I didn't see the key. And so that's when I finally . . . saw the key there. And . . . matter of fact, I texted her about that.

Q:      Okay.
. . .
A:      That's when we texted.

Q:      . . . Did you find the key before or after the fire?

A:      It was, [it] might've been just before, it might've been just after. It was [one] of the two, I can't remember. But it was because when I went to go use the key afterwards, because I couldn't, I couldn't secure that back door, and the neighbor that had the son that wanted to rent it she was with me and I tried to use the keys in the back and it didn't work anyway.
. . .
Q:      Say that again. Was this after the fire or before the fire?

A:      . . . This was after the fire. I was with the neighbor, the neighbor right across the street. . . .

Q:      Okay.

A:      I was with her, we were talking about the garage because we were . . . she must've come over here with somebody and they were supposed to take stuff out of the garage and they didn't do it. And so I said, "Well, no, the motorcycle and some of the other stuff is still in the garage." And she said, well, they came over, so and so (inaudible). I said, "Well, I'm gonna have

4

to fix this door." Because I couldn't keep it closed . . . the way the lock was. So I tried to lock it back but . . . the key wouldn't work on the lock. So . . . the key wasn't any good anyway, so I just threw it in the garbage. But she saw me, you know, I said, "Well if this ever comes up and they have to ask you you could tell 'em that, yeah, I threw the key in the garbage.

Q:     Okay. Did you enter the risk address prior to the fire?

A:     No.

Q:     Okay. Did you enter the risk address the day before the fire? This would've been the 17th.

A:     No.

Q:     Okay. Did you (cross-talk)

A:     I was supposed to go in the 17th, yeah, I was supposed to go in the 17th but she said she didn't have any of her things out. So then I said, well, no, I won't go in because I've had problems with other tenants about going in when their . . . things are there. So I said I'll just leave it alone. And . . . matter of fact I texted her . . . saying that, you know, "I just left you alone because you said you still had things in there." And I can't remember what text. It's all in the string . . .

Q:     So, so, hold on a second. Because you told me, you told me that you're not sure if you got the key before the fire or after the fire. But now (cross-talk)

A:     Right.

Q:     But now you just told me that you were supposed to be in, go into the house on the day (cross-talk)

A:     I was supposed to (cross-talk)

Q:     . . . I was supposed to go in. So I must've had the key 'cause I was supposed to go in the 17th. But then when, when she said that she didn't have her things out I text[ed] her and said, and it might've been a little later, but I can't remember for sure. But I texted her and I said, "Well, if, if you still have things there I'm not gonna go in because that might cause a problem."

*Id.* at 855-57.

5

On May 26, 2022, a representative of Defendant also interviewed Plaintiff's tenant, Williams. *Id.* at 933-97. She said she moved out of the Property sometime in April. *Id.* at 935-36; 965-66. However, she "still had property there." *Id.* at 966. Williams stated she gave Plaintiff the key to the house sometime two to three weeks before the fire (by leaving it in his mailbox) and notifying him via text. *Id.* at 961-63.

Condition of the Property

In the May 23, 2022, interview, Defendant's agent additionally asked Plaintiff about structural problems with the house and water issues:

Q: All Right. Uh, so there was . . . a leak underneath the kitchen sink and that was fixed. . . Any problems with the main water line or the sewer line?

A: No.

Q: Okay. Did you have any structural problems in the house?

A: No.

Q: Any . . . water leaks from rain?

A: No.

Q: Okay. Did you have any . . . pooling of water in the basement?

A: . . . Not that I'm aware of.

Q: . . . Any problems with the foundation?

A: . . . Not that I'm aware of. . . .

Q: Any complaints about the foundation, uh, cracking?

A: Not that I'm aware of. But I . . . do remember [Williams] saying that—she said something about she had some moisture in the . . . basement, but that was a while back. I . . . vaguely remember that.

Q: Okay. . . Any complaints whatsoever we haven't talked about about the house? . . . Anything that may . . . [have] needed repair or maintenance . . . ?

6

A:    . . . The back of the house when you go out the back door, it was a . . . I would call it an awning maybe.

Q:    Okay.

A:    And the wind had . . . [blown] it . . . loose and she had told me that her father would take care of it, but he never did. And I ended up putting that on the curb as well when I got rid of the rest of the debris in the back of the house.

*Id.* at 897-98.

During Williams's interview, she stated she never used the basement or stored anything in it because it was "always wet," "always stinky," and had black mold. *Id.* at 943-44. She further thought it was due to "a foundation problem." *Id.* at 943. Williams said she informed Plaintiff of the issues with the basement and that they texted and spoke about it. *Id.* at 944, 946; *see also id.* at 831 (April 19, 2022 text message from Williams to Plaintiff stating the basement is "not dirty or anything it's actually really clean just all wet down there an[d] stuff."). She thought it was going to cost $15,000-$20,000 to fix the basement, based on what others (her mother and uncle) told her. *Id.* at 944, 953.

At the subsequent July 2022 interview, Plaintiff was also questioned about water or dampness in the basement. *Id.* at 852-54, 858-61. Plaintiff testified that the previous tenant (Williams's mother) identified an issue with moisture toward the back of the basement, but he had cleaned the eaves and his contractor repaired a window to address it. *Id.* at 852. He stated the prior tenant never complained further about dampness or water in the basement. *Id.* Plaintiff further testified that Williams never complained about problems with water in the basement. *Id.* at 853-54.

Plaintiff submitted a sworn affidavit in response to the pending Motion that addresses, in part, the condition of the home. Plaintiff avers that an "in-depth inspection" of the Property

7

occurring at some point after he acquired it in 2017 "did not discover any issue with the foundation of the property." (Doc. 19, at 19). With regard to water issues and foundational issues, Plaintiff states:

12. In 2020, it was discovered that when it rained, water was coming down the back wall of the basement.

13. I retained a contractor who had previously done work for me, Daryl White, to investigate the cause of the water.

14. Daryl White could not initially determine the cause of the water.

15. Daryl White then told me to initiate an insurance claim to have them determine if the cause of the water was due to a foundation issue.

16. Daryl White told me that the cause may be covered under my insurance policy.

17. I initiated a claim with my insurer, USAA, relative to the water issue.

18. Near that same time Daryl White suggested I get a quote from a foundation repair company.

19. Based upon Daryl White's advice I contacted Seagate Waterproofing who inspected the Property and provided a quote for repairing the foundation in the approximate amount of $16,000.

20. I provided a copy of Seagate Waterproofing's quote to USAA.

21. USAA denied the claim.

22. Daryl White continued to analyze the water issue and discovered that the water was entering the basement not because of any foundation issue, but from an improperly sealed bedroom window in the back of the house.

23. Daryl White repaired the window and no further water intruded into the basement.

24. Daryl White's repair cost me approximately $75.

25. After the repair, water no longer entered the basement, and both Daryl White and myself concluded that there was no foundation issue and spending $16,000 would be waste of money.

26. The fact that the Property would remain habitable without the work quoted by Seagate Waterproofing, I decided not to repair the foundation.

27. I never received any notice from Tanequa Williams, her mother or any other tenant of water intrusion or mold in the basement.

28. Tanequa Williams may have mentioned that the basement was damp, but I assume most basements are.

29. I do not consider dampness to be water intrusion.

30. I did not make any untruthful statements to USAA in their investigation of the fire loss.

31. When asked if I knew of any foundation issues with the Property I truthfully responded "No" as I do not think there was ever a foundation issue with the Property.

32. To this date I do not think there is an issue with the foundation of the Property.

(Doc. 19, at 19-20).

Additional Investigation

Plaintiff purchased the Property through a probate court process for $1,000. (Doc. 19, at 20); *see also* Doc. 16-2, at 1157. At the time of purchase, the Property was encumbered by an $18,610.79 real estate tax lien. *See id.* Plaintiff was unaware of this at the time of purchase, but upon learning thereof, entered into a repayment plan with Lucas County. (Doc. 19, at 20).

Plaintiff told Defendant during the May 23, 2022, interview that he was at the gym for approximately two hours the morning of the fire. (Doc. 16-2, at 906). The gym is ten to fifteen minutes from his house, which itself is near the subject Property. *Id.*; *see also id.* at 1156. He had to scan a barcode to get into the gym. *Id.* at 909; *see also* Doc. 17, at 20.

Denial Letter

On January 18, 2023, Defendant sent Plaintiff a denial letter stating that the fire loss was not covered. (Doc. 16-2, at 1156-59). As the reason for denial, it stated the loss

9

isn't covered because there is sufficient evidence to support the probability of your involvement in intentionally setting your house on fire and making false statements about your knowledge of these events and your knowledge of the basement foundation and water intrusion issues.

*Id.* at 1156. It further set forth a "Factual Summary:"

On 5/18/22 you advised USAA General Indemnity Company (USAA GIC) that your property at 3401 Gorney Place, in Toledo, Ohio had been damaged by fire. On the morning of the fire, you stated you were following your normal routine of getting up around 6:00am and proceeding to the local gym for a morning workout. USAA GIC records show that you reside at 3419 Gorney, or just a few houses away from the rental property. You claimed that that you stopped to get gas at a Costco on the way to the gym at around 6:35am. USAA GIC contacted the gym who confirmed you arrived that morning and checked in with your membership card at 6:55am. The fire at your property was reported to 911 at 7:15am. A Google Maps search shows it is approximately 15-minute drive from the rental property to the gym.

*Id.* The letter then summarized the findings of the fire investigator, and then continued:

By way of background on the rental property, former tenant, Tanequa Williams told USAA GIC that she had vacated the property approximately one and a half months prior to the fire date, but still had a few items of personal property located in the house and the garage. In her statement to USAA GIC, Ms. Williams made it very clear that the basement of the property suffered a significant foundation and water intrusion problem. She stated the basement was always wet and stinky. She believes there was black mold in the basement. She also stated emphatically that you were aware of these problems in the basement as the two of you had spoken about it in text messages. Ms. Williams says that based on information provided by her mother, Michelle Williams, that the foundation problem would have been expensive to remedy, possibility to the tune of $15,000 to $20,000.

*Id.* at 1156-57. The letter then identified the real estate tax lien associated with the Property. *Id.*

at 1157. It further set forth the alleged misrepresentations upon which Defendant based its

denial:

When speaking with you regarding this loss, you were asked about any prior issues with water intrusion and/or moisture issues. You denied any knowledge of water leaks from rain, pooling of water in the basement, or problems with the foundation. You did indicate during your initial statement with USAA GIC that were "not aware" of these types of issues. You acknowledged remembering the tenant, Ms. Williams, making a comment about some moisture only in the

10

basement. During your Examination Under Oath[1] testimony, we again addressed these same issues. You then said you didn't believe that water in the basement was a serious issue and did not remember Ms. Williams or her mother ever complaining about water in the basement. You stated clearly you had never had the foundation inspected in the basement.

In addition, during your sworn testimony, you confirmed that prior to the date of the fire, you did locate the keys to the rental property Ms. Williams had left inside the mailbox. This information confirms you had access to the house on the date of the fire.

A review of your USAA GIC claim history shows that you made a prior claim for "foundation issues["], including cracks in the walls of your basement of the rental property. This claim was presented in July 2020 and the claim was denied based upon applicable coverage exclusions. During the handling of that claim, you presented to USAA GIC an EverDry Waterproofing estimate which describes a very substantial foundation repair plan at the cost of $16,200. The handling of this claim by USAA GIC reflects statements you made during the claim which indicate and confirm your knowledge of a foundation and water intrusion issue and are contrary to statements you made during this pending fire loss claim two years later.

Based on your initial statement and those made during your Examination Under Oath being contrary to the evidence obtained through our investigation into this loss, your claim is denied based upon the concealment, misrepresentation or fraud policy condition cited herein.

*Id.* at 1157. The letter then cited the policy language regarding concealment, misrepresentation or fraud as well as an exclusion for intentional loss. *Id.* at 1158.[2]

---

1. The Court observes that Defendant does not identify an Examination Under Oath in the record, but only two interviews on May 23, 2022 and July 12, 2022. At the July 2022, interview, the interviewer stated that it was "a supplemental interview" and noted that Defendant "may request at a later time that you provide a sworn examination under oath to the terms of your insurance contract." *Id.* at 849.

2. The Policy states, under a section entitled "LOSSES WE DO NOT COVER:"
   1. We do not insure for loss or damage consisting of, or caused directly or indirectly by any of the following, regardless of:
   (i) The cause of the excluded event or peril, or any other cause of the same loss, whether or not any other cause acts concurrently or in any sequence with the excluded cause, peril, or event to produce the loss; or
   (ii) Whether the event or damage occurs suddenly or gradually, involves isolated or widespread damage, or occurs as a result of any combination of a. through k. to produce the loss.

STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any factual matter in dispute; the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials").

---

     \* \* \*

     **h. Intentional Loss**, meaning loss arising out of any act any **"insured"** commits or conspires to commit with the intent to cause a loss. Even **"insureds"** who did not commit or conspire to commit the act causing the loss are not entitled to coverage.

(Doc. 16-2, at 26-28). Defendant's Motion for Summary Judgment, however, relies solely upon the concealment, misrepresentation or fraud clause of the Policy. *See* Doc. 16.

12

## DISCUSSION

Plaintiff's Complaint asserts three causes of action based on Defendant's denial of his insurance claim: (1) breach of contract; (2) bad faith, and (3) declaratory judgment. (Doc. 1-1, at 6-8). The Court addresses each in turn. Defendant moves for summary judgment, arguing Plaintiff made material misrepresentations regarding his access to the Property and structural damage to the Property that justify its denial of his claim. (Doc. 16). For the reasons set forth below, the Court denies Defendant's motion as to Plaintiff's breach of contract claim and grants it as to Plaintiff's bad faith and declaratory judgment claims.

Breach of Contract

"[A]n insurance policy is a contract between an insured and the insurer." *Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 861 N.E.2d 121, 126 (Ohio 2006). "Concealment, misrepresentation, and fraud clauses, such as the one in [Plaintiff's] insurance policy with [Defendant], are enforceable under Ohio law." *Am. Land Inv. Ltd. v. Allstate Ins. Co.*, 798 F. App'x 910, 913-14 (6th Cir. 2020) (citing *Hague v. Allstate Prop. & Cas. Ins. Co.*, 2014 WL 5465841, at *7 (N.D. Ohio)). To void an insurance contract due to concealment, misrepresentation, or fraud, the insured must make a material misrepresentation. *McCurdy v. Hanover Fire & Cas. Ins. Co.*, 964 F. Supp. 2d 863, 869-70 (N.D. Ohio 2013).

"For [Defendant] to prevail on its motion for summary judgment" with respect to such a clause, "the Court must conclude that there are no genuine issues of material fact as to: (1) the willful nature of Plaintiff['s] statements and (2) the materiality of Plaintiff['s] alleged misrepresentations." *Brewer v. State Farm Fire & Cas. Co.*, 2014 WL 12623359, at *3 (S.D. Ohio) (citing *Parker v. State Farm Fire & Cas. Co.*, 1988 WL 1058394, at *14 (N.D. Ohio)). Thus, "[a]s to the intent requirement, [Defendant] cannot rely solely on the fact that some of

13

Plaintiff['s] statements may have been false; rather, Plaintiff['s] misrepresentations must have been made willfully, in a manner 'calculated either to discourage, mislead or deflect the insurer's investigation.'" *Id.* (quoting *Joseph v. State Farm Fire & Cas. Co.*, 2013 WL 663623, at *9 (S.D. Ohio)); *see also Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 536 (6th Cir. 2014) ("In order for [the insurance company] to validly invoke the concealment provision voiding the insurance contract, the insured must have *intentionally* concealed or misrepresented a material fact; false statements alone are not enough.").

To deny coverage, a misrepresentation must also be "material." "[A] misrepresentation will be considered material if a reasonable insurance company, in determining its course of action, would attach importance to the fact misrepresented." *Latimore v. State Farm Fire & Cas. Co.*, 2012 WL 3061263, at *4 (N.D. Ohio) (quoting *Abon, Ltd. v. Transcon. Ins. Co.*, 2005 WL 1414486, at *13 (Ohio Ct. App.)). The subject of the misrepresentation "need not ultimately prove to be significant to the disposition of the claim, so long as it was reasonably relevant to the insurer'' investigation at the time." *Abon*, 2005 WL 1414486, at *13. Moreover, "[t]he materiality of a misrepresentation is a mixed question of law and fact that under most circumstances should be determined by the trier of fact." *Id.* Finally, "(a) defense based on an exception or exclusion in an insurance policy is an affirmative one, and the burden is cast on the insurer to establish it." *Continental Ins. Co. v. Louis Marx Co., Inc.*, 64 Ohio St. 2d 399, 401, 415 N.E.2d 315 (1980) (quoting *Arcos Corp v. Am. Mut. Liab. Ins. Co.*, 350 F. Supp. 380, 384 (E.D. Pa. 1972)).

*Access to the Property*

Defendant first argues that Plaintiff made a material misrepresentation regarding his possession of a key to the Property prior to the fire. Defendant contends that at the May 23,

14

2022, interview, Plaintiff "denied having access to the Property at the time of the fire" (Doc. 16, at 4) (citing Doc. 16-2, at 890), and at the July 12, 2022, interview "claimed he did not receive the house key until after the fire" (Doc. 16, at 5) (citing Doc. 16-2, at 866). Defendant contends these statements are material because they undermined Defendant's investigation into Plaintiff's motive and opportunity to set the fire.

Upon review, the Court finds Defendant overstates Plaintiff's interview responses. Although Defendant represents that Plaintiff "denied having access to the property" and "claimed he did not receive the house key until after the fire," a review of Plaintiff's statements in this regard shows they were equivocal. Moreover, Defendant's argument is focused solely on the materiality of the alleged misrepresentations. Even if Defendant is correct that these statements were material due to their impact on the fire investigation, *Am. Land Inv. Ltd.*, 798 F. App'x at 915, Defendant does not identify sufficient evidence to demonstrate Plaintiff willfully mislead it. That is, Defendant's argument does not speak to the intent behind Plaintiff's statements.

The overall context surrounding Plaintiff's statements about when precisely he had access to the Property supports the conclusion that a material fact dispute remains over both whether a material misrepresentation was made and Plaintiff's intent regarding any alleged misrepresentation. As quoted above in the background section, Plaintiff's statements addressing when he received the key were not definitive, but equivocal. *See* Doc. 16-2, at 890 ("About the same time. It was . . . either the day after or . . . I would have to look at the texts[.] But I can't remember what day."); *id.* at 856 ("I[t] might've been just before, it might've been just after. It was [one] of the two, I can't remember."). And the evidence is not so one-sided that the Court can determine, as a matter of law, that he intentionally made misrepresentations.

15

This is in contrast to *American Land Investment*, upon which Defendant relies, wherein the court found the case to present "one of the rare instances in which testimony should be rejected without a trial at the summary judgment stage because no reasonable person would believe it." 98 F. App'x at 914. Here, a reasonable jury examining the evidence—including Plaintiff's two statements and the text messages—regarding his access to the Property could conclude Plaintiff simply did not remember when he obtained a key to the house and did not make any misrepresentation "willfully, in a manner 'calculated either to discourage, mislead or deflect the insurer's investigation.'" *Brewer*, 2014 WL 12623359, at *3 (quoting *Joseph*, 2013 WL 663623, at *9); *see also* Doc. 16-2, at 33 (policy language stating coverage may be denied if insured "*[i]ntentionally* concealed or misrepresented any material fact or circumstance") (emphasis added). As one Ohio court explained:

> This is not a situation in which reasonable minds could come to but one conclusion when viewing the evidence most strongly in favor of appellant. Intentional concealment or misrepresentation is a requirement for fraud under the terms of the contract. Appellant's deposition testimony that his misstatements were inadvertent raises a question of fact for a factfinder to determine, and reasonable minds could differ as to whether he intentionally concealed or misrepresented the names of those who had keys to the premises.

*Freeland v. Grange Mut. Cas. Co.*, 2014 WL 5867039, at *3 (Ohio Ct. App.).

Thus, the Court finds Defendant is not entitled to summary judgment based on an alleged material misrepresentation regarding Plaintiff's access to the Property.

*Condition of Property / Foundation Issues*

Next, Defendant contends Plaintiff made material misrepresentations about water intrusion and foundation issues at the Property. (Doc. 16, at 8-13). Again, although Defendant's argument focuses on the materiality of such alleged misrepresentations as to its investigation into possible motive for an intentionally-set fire, the Court finds Plaintiff has identified evidence

16

creating a genuine dispute of fact regarding whether such a misrepresentation was made and whether Plaintiff had intent to mislead. First, although Defendant in its denial letter and in its motion relies upon Williams's statements that she informed Plaintiff that there was water in the basement and mold, Plaintiff submits a sworn affidavit to the contrary. *See* Doc. 19, at 19 ("I never received any notice from Tanequa Williams, her mother or any other tenant of water intrusion or mold in the basement."). Second, Plaintiff's affidavit states Williams may have mentioned the basement was damp, but he did "not consider dampness to be water intrusion" and assumed most basements are damp. *Id.* Third, as to the foundation issues, Plaintiff's affidavit again creates a dispute of fact regarding whether he made a misrepresentation, and whether he intended to mislead, when he stated the Property had no foundation issues. *See id.* at 20 ("When asked if I knew of any foundation issues with the Property I truthfully responded 'No' as I do not think there was ever a foundation problem with the Property" and "To this date I do not think there is an issue with the foundation of the Property."); *see also id.* at 19 ("I did not make any untruthful statements to USAA in their investigation of the fire loss."). Although Defendant is correct that this contradicts Plaintiff's submission of an insurance claim related to water issues, Plaintiff's affidavit again provides an explanation therefor and thus a dispute of fact. *See id.* at 19.

Thus, the Court finds Defendant is not entitled to summary judgment based on an alleged material misrepresentation regarding the condition of the Property and finds this is instead a question to be resolved by the trier of fact.

Bad Faith

In Ohio, "an insurer has a duty to act in good faith in the processing and payment of the claims of its insured." *Staff Builders, Inc. v. Armstrong*, 525 N.E.2d 783, 788 (Ohio 1988). "[A]n

17

insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor." *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 400 (Ohio 1994) (quoting *Staff Builders*, 525 N.E.2d at 788). Denial of a claim is not reasonably justified when it is done arbitrarily and capriciously. *See Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315, 1320 (Ohio 1983); *Thomas v. Allstate Ins. Co.*, 974 F.2d 706, 711 (6th Cir. 1992). However, denial of a claim may be reasonably justified when "the claim was fairly debatable and the refusal was premised on either the status of the law at the time of the denial or the facts that gave rise to the claim." *Tokles & Son v. Midwestern Indemn. Co.*, 605 N.E.2d 936, 943 (Ohio 1992); *Maxey v. State Farm Fire & Cas. Co.*, 689 F. Supp. 2d 946, 953 (S.D. Ohio 2010). "The test, therefore, is not whether the defendant's conclusion to deny benefits was *correct*, but whether the decision to deny benefits was arbitrary or capricious, and there existed a reasonable justification for the denial." *Thomas*, 974 F.2d at 711. "Stripped to the bare essentials, the central factual issue in the bad faith claim is whether or not [the insurer] had a reasonable basis to deny [the insured's] claim." *Abon, Ltd.*, 2005 WL 1414486, at *6.

"On a motion for summary judgment, Ohio law directs courts to assess bad-faith-denial-of-coverage claims from the perspective of what information motivated the insurer's denial." *Smith v. Allstate Indem. Co.*, 304 F. App'x 430, 432 (6th Cir. 2008); *Cook v. Erie Ins. Co.*, 2020 WL 13453595, at *4 (S.D. Ohio) ("The key inquiry is whether the insurance company's reasoning for its decision to deny or delay benefits was reasonably justified."). As another court explained:

> To grant a motion for summary judgment brought by an insurer on the issue of whether it lacked good faith in the satisfaction of an insured's claim, a court must find after viewing the evidence in a light most favorable to the insured, that the

18

claim was fairly debatable and the refusal was premised on either the status of the law at the time of the denial or the facts that gave rise to the claim.

*Abon, Ltd.*, 2005 WL 1414486, at *5. By contrast,

> [t]o withstand a motion for summary judgment in a bad faith claim, an insured must oppose such a motion with evidence which tends to show that the insurer had no reasonable justification for refusing the claim, and the insurer either had actual knowledge of that fact or intentionally failed to determine whether there was any reasonable justification for refusing the claim.

*Id.*

Defendant contends there was nothing arbitrary and capricious about its decision. Specifically, it argues its decision was:

> based on extensive evidence uncovered during a thorough investigation . . . [which] revealed multiple inconsistencies in Plaintiff's statements, including false denials about his access to the property, his knowledge of longstanding foundation and water damage, and the timing of when he received the house key. These misrepresentations were material to the insurer's ability to evaluate the claim, particularly where the fire investigation revealed evidence of arson in five separate area s of the home. In light of these contradictions, the insurer had ample contractual and factual grounds to deny coverage under the policy's misrepresentation and fraud provisions.

(Doc. 16, at 14). Defendant further cites its "comprehensive investigative process that included interviews with Plaintiff and his former tenants, review of text message communications, consultation with fire and structural experts, and coordination with law enforcement authorities." *Id.*

Plaintiff responds that Defendant's decision was based on "[c]onjecture, speculation, conclusory allegations and subjective beliefs" and faults Defendant for not more thoroughly investigating Williams, who had admitted accessing the home the day before the fire. (Doc. 19, at 15).

As set forth above, the Court finds there are factual disputes regarding whether Plaintiff intentionally misrepresented material facts. Despite this, however, it finds that no reasonable jury

19

could find Defendant's actions in the totality of the circumstances to be arbitrary and capricious. That is, on the facts Defendant had, the claim was, at least, "fairly debatable . . . and the refusal was premised on . . . the facts that gave rise to the claim." *Abon, Ltd.*, 2005 WL 1414486, at *5. And although Plaintiff has presented an alternative theory, he simply has not raised a question of fact regarding whether Defendant "had no reasonable justification for refusing the claim, and the insurer either had actual knowledge of that fact or intentionally failed to determine whether there was any reasonable justification for refusing the claim." *Id.*

The Court therefore grants Defendant's Motion as to Plaintiff's bad faith claim.

Declaratory Judgment

Defendant further moves for summary judgment on Plaintiff's separate claim for declaratory judgment, arguing it is duplicative of Plaintiff's breach of contract claim. (Doc. 16, at 15). Plaintiff's opposition brief does not respond to this argument specifically, only addressing his breach of contract and bad faith claims. *See* Doc. 19.

First, as Plaintiff presents no response to Defendant's argument for dismissal of the declaratory judgment claim, he has forfeited any such argument. *See Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 324 (6th Cir. 2023) ("When a litigant fails to address a claim in response to a motion for summary judgment, that claim is deemed abandoned or forfeited.").

Second, in any event, Defendant's argument for dismissal of the declaratory judgment claim is well-taken. In his declaratory judgment claim, Plaintiff "seeks a declaration by this Court that he is entitled to full coverage under the Policy." (Doc. 1-1, at 8). In his breach of contract claim, he asserts that he is entitled to damages pursuant to Defendant's failure to pay under the Policy. *Id.* at 6-7. Thus, both claims address whether Defendant had an obligation to cover Plaintiff's loss. As other courts have found "it is clear in the present case that a declaratory

judgment would be redundant with the relief already sought for breach of contract." *Jerome-Duncan, Inc. v. Auto-By-Tel, LLC*, 176 F.3d 904, 908 (6th Cir. 1999); *McGlone v. Centrus Energy Corp.*, 2020 WL 4431482, at \*16 (S.D. Ohio) (dismissing claim for declaratory judgment as duplicative of plaintiff's claim for breach of contract); *see also Anton v. Petras*, 2025 WL 2364724, at \*8 (Ohio Ct. App.) ("[T]he remainder of Dr. Anton's declaratory-judgment claim duplicates the breach-of-contract claim asserted in Count 2. Accordingly, we find no error in the trial court resolving Counts 1 and 2 together under a breach-of-contract analysis." (citing *Mid-Am. Fire & Cas. Co. v. Heasley*, 863 N.E.2d 142, 146 (Ohio 2007) ("The granting or denying of declaratory relief is a matter for judicial discretion.")).

Defendant's Motion is therefore granted as to the declaratory judgment claim.

### CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendant's Motion for Summary Judgment (Doc. 16) be, and the same hereby is, GRANTED IN PART (as to Plaintiff's claims for bad faith and declaratory judgment) and DENIED in part (as to Plaintiff's claim for breach of contract).

  s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

Dated: July 15, 2026

21